Alexander M. CALENDA, M.D., Plaintiff,

v.

RHODE ISLAND BOARD OF MEDICAL REVIEW, et al., Defendants.

Civ. A. No. 83–0272 S.

United States District Court,
D. Rhode Island.

June 8, 1983.

Thomas A. DiLuglio, Johnston, R.I., for plaintiff.

James M. Jerue, Counsel, R.I., Bd. of Medical Review, Providence, R.I., for defendants.

## MEMORANDUM AND ORDER

SELYA, District Judge.

This is an action brought pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief. The plaintiff is an ophthalmologist, who has been licensed to practice medicine in Rhode Island for some twenty-five years. He is board-certified in his specialty; a diplomat of the American Board of Ophthalmology; a fellow of the American College of Surgeons; and chief of the department of ophthalmology at St. Joseph Hospital and at Kent County Memorial Hospital. The lead defendant is the Rhode Island Board of Medical Review (the "Board") and the individual defendants are the nine incumbent members of the Board.

The Board was created by R.I.Gen.Laws § 5–37.1–1 et seq. (the "Act"). The statutory mosaic gives the Board the power to investigate, prosecute, adjudicate and sanction members of the medical profession for "unprofessional conduct" as defined by § 5–37.1–5 of the Act. Pursuant to its statutory prerogatives, the Board initiated an investigation of the plaintiff, designated a hearing committee,[1] and, on or about August 21, 1981, furnished plaintiff with notice of the proceedings and a specification of the charges against him. It is undisputed that the Board, in so doing, acted on its own initiative, and in the absence of a formalized complaint from any third person. The charges, as described in paragraph six of the plaintiff's motion for preliminary injunctive relief, were of a serious nature: the litany included overutilization of services; performance of unnecessary diagnostic tests; failure to adhere to peer review standards; gross overcharging of patients; and professional incompetency. Subsequent to issuance of the notice, hearings were held,[2] during which plaintiff was represented by counsel and was accorded plenary due process rights. See R.I.Gen.Laws § 5–37.1–8.

The hearing committee's report, dated January 19, 1983 ("Report"),[3] found certain described abuses and recommended in substance that plaintiff be (i) reprimanded for the overutilization of services; (ii) ordered to desist from the provision of excessive and unnecessary diagnostic ultrasound to

---

1. The hearing committee comprised Dr. Cole, Dr. DiMaio and Mr. Gifford, all of whom are members of the Board and each of whom is a defendant in this proceeding. Simple mathematics proves that they constitute less than a majority of the full Board.

2. Four evidentiary sessions took place in this time frame (September 23, 1981; January 13, 1982; June 16, 1982; and September 15, 1982).

3. Plaintiff has made the Report a matter of record here, having annexed the same to an affidavit filed on May 16, 1983 in support of the prayer for preliminary injunction.

patients; and (iii) placed on probation for one year. Upon plaintiff's imprecation, hearings before the full Board were continued so that plaintiff's successor counsel could familiarize himself with the record. Thereafter, the plaintiff requested that the Board hold additional hearings and receive new evidence, pursuant to R.I.Gen.Laws § 5–37.1–11. The Board declined to do so, and scheduled a meeting for April 20, 1983, for the purpose of formally accepting and acting upon the Report.

On that morning, however, the plaintiff filed the instant action, seeking temporary injunctive relief to prohibit the defendants from proceeding in the premises. Only a matter of minutes prior to the scheduled commencement of the April 20th session, this Court granted the temporary restraining order, enjoined further proceedings (including the unveiling of the Report), and set the matter down for a hearing on preliminary injunction. On April 28, 1983, that hearing was held; certain stipulations of fact were made between the parties;[4] the plaintiff rested on his complaint and on affidavits then and thereafter submitted; the defendants made no evidentiary presentation; and briefing was undertaken and later seasonably accomplished. The question of preliminary injunctive relief is now in order for determination.

The centerpiece of plaintiff's argument is that, because R.I.Gen.Laws § 5–37.1–6 confers upon the Board the power to initiate, investigate, hear and report upon charges of unprofessional conduct, it creates an unconstitutional risk of bias, prejudice and unfairness, thereby violating both the guarantee of due process commemorated by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. The plaintiff builds upon this foundation by asseverating that §§ 5–37.1–12 and 5–37.1–13 of the Act work incremental due process violations in that the same Board members who conduct the investigation and who comprise the hearing committee ultimately

determine the merits of the charges, adjudicate guilt and impose a sanction. The capstone of plaintiff's contention is that the Board has handled its investigation of Dr. Calenda in an arbitrary and capricious manner by refusing to supply him with uncensored minutes of the meeting at which the Board decided to initiate its investigation. In consequence of these perceived wrongs, plaintiff seeks declaratory relief and the issuance of an injunction preventing defendants from proceeding further with any actions against him resulting from the complaint initiated by the defendants.

In order to obtain preliminary relief, plaintiff must satisfy four criteria:

> The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). *Accord Scuncio Motors, Inc. v. Subaru of New England, Inc.,* 555 F.Supp. 1121, 1124 (D.R.I.1982). All four of these are salient. The First Circuit, however, considers the third component, the likelihood of success on the merits, to be crucial to the granting of preliminary injunctive redress. *Massachusetts Association of Older Americans v. Sharp,* 700 F.2d 749, 751 (1st Cir.1983); *Local Div. 589, Amalgamated Transit Union v. Massachusetts,* 666 F.2d 618, 645 (1st Cir.1981), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982); *Auburn News Co. v. Providence Journal Co.,* 659 F.2d 273, 277 (1st Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Scuncio Motors, Inc. v. Subaru of New England, Inc.,* 555 F.Supp. at 1124. It is important, as well, that the plaintiff convince the Court that the public

---

**4.** The main thrust of the stipulation was an accord to the effect that each and all of the factual allegations contained in the first seven paragraphs of the plaintiff's motion for preliminary injunction are, for purposes of this proceeding, to be taken as true.

interest will not adversely be affected by the granting of injunctive relief. *See Massachusetts Association of Older Americans v. Sharp,* 700 F.2d at 751 and cases cited therein.

In the case at bar, the plaintiff has fallen woefully short of measuring up to the foregoing yardstick.

Turning first to the question of irreparable injury, Dr. Calenda has alleged that his reputation is endangered by what he perceives to be the Board's pell-mell (and self-propelled) rush to judgment in his case, and by the public notoriety which will necessarily be attendant upon disclosure of the hearing committee's findings. It cannot be gainsaid that a physician's good name is an invaluable asset in the private practice of medicine. Yet, the plaintiff's claim comes with unique accouterments of ill grace in this case—as publicity anent the charges has already resulted from the filing of this action without any concomitant motion to seal the court papers.[5] Further, the plaintiff filed affidavits in connection with his motion for preliminary injunction, commenting at length about the details of the charges and annexing as an exhibit the unexpurgated Report. Dr. Calenda made no effort to enswathe these documents within the integument of a protective order. The Report has, therefore, become a public record: it is readily available to all. The Act itself provides for the privacy of preliminary investigations, a safeguard which, in the normal course of events, would by statute continue to endure until the time when action is taken by the Board as a whole. R.I.Gen.Laws § 5–37.1–6. This confidentiality has been exploded here by the plaintiff's voluntary acts; he has thrown wide the doors to such gibbeting as may ensue. Any further damage along these lines would be *de minimis.* To credit Dr. Calenda's irreparable injury argument would require the Court to close its eyes to the natural consequences of the plaintiff's volitional decision to proceed in the manner elected by him. This Court will not engage in any such blind-man's buff; and finds, on this record, that there is no adequate showing of irremediable harm.

The Court's finding as to the absence of irretrievable injury is highlighted when one considers the second and fourth elements of the *Bellotti* archetype. In so doing, the focus must be, in the first instance, on adverse consequences to the defendants; and in the second instance, on the public interest. These considerations tend to merge where, as here, the proposed injunction would curb the endeavors of a state agency which is constituted as a front-line guardian of the public health. "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982), citing *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941). While Rhode Island legislative history is neither formally collected nor codified and is to that extent elusive, it is apparent from the face of the Act that the Board was established to insure that residents of Rhode Island receive health care from competent, principled physicians. Defendants would be prevented from fulfilling this important duty were an interim injunction to issue in this case, thereby jeopardizing the public health. It is difficult to conjure up a state interest more compelling

**5.** While the plaintiff, in his complaint, did pray, among other things, for maintenance of the confidentiality of the proceedings, he (i) filed the suit without any specific request to place the documents under seal; (ii) did not request any such prophylaxsis in the demands for relief contained in his motion for interim injunctions; (iii) failed to renew that prayer, or to call it to the Court's attention, either at the April 20th conference vis-a-vis the temporary restraining order or at the chambers conference preceding the April 28th hearing; (iv) permitted that hearing to go forward *in open court* without demurrer of any kind; and (v) unilaterally docketed the affidavits (including the attached Report) without asking for any kid-glove treatment. The plaintiff has invited, and cannot now reject as unwelcome company, the application of the hoary maxim: *Facta sunt potentiora verbis.* In this instance, actions do speak louder (and more plainly) than words; and any initial thrust to preserve confidentiality has patently been waived.

than oversight of the professional conduct of local health care providers, nor a subject in which Rhode Island's citizenry would have a more legitimate stake. The public interest, therefore, militates heavily against the imposition of hasty judicial restraints; and any marginal injury envisioned by the plaintiff is outweighed by the possible danger inherent in a court-mandated shutdown of the regulatory machinery.

Finally, and undoubtedly most critical at this stage in the proceedings, *e.g., Auburn News Co. v. Providence Journal Co.,* 659 F.2d at 277, the plaintiff has failed to persuade the Court that the provisions of the Act are materially distinguishable from the statute at issue in *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).[6] There, the question was whether the suspension of a physician's license by the Wisconsin Examining Board ("W.E.B.") constituted a denial of procedural due process. In the Wisconsin framework, the W.E.B. both instituted and conducted the investigation, and then determined whether or not to suspend the accused's license. *Id.* at 46, 54, 95 S.Ct. at 1464, 1468. The Supreme Court held that, while notions of a "fair trial in a fair tribunal" necessarily apply to administrative agencies as well as to courts, *id.* at 46, 95 S.Ct. at 1464, "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation...." *Id.* at 58, 95 S.Ct. at 1470. The Court's language is instructive:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Id.* at 47, 95 S.Ct. at 1464.

Nor is *Withrow* in any respect aberrational. Its holding tracks principles of jurisprudence firmly established in this circuit. *See, e.g., Pangburn v. Civil Aeronautics Board,* 311 F.2d 349 (1st Cir.1962); *Roccaforte v. Mulcahey,* 169 F.Supp. 360 (D.C. Mass.), *aff'd,* 262 F.2d 957 (1st Cir.1958) (per curiam). As stated by Judge Hartigan, writing for a unanimous panel in *Pangburn:*

> It is well settled that a combination of investigative and judicial functions within an agency does not violate due process.

*Pangburn v. Civil Aeronautics Board,* 311 F.2d at 356.

Here, plaintiff has presented no facts or circumstances indicating that the risk of bias or unfairness is intolerably high, *Withrow v. Larkin,* 421 U.S. at 58, 95 S.Ct. at 1470, or that the objectivity or forthrightness of the individual defendants is skewed. *Id.* at 47, 95 S.Ct. at 1464. Rather, the evidence before the Court, combined with a careful reading of the Act, demonstrates that the Board has taken pains to insure that the proceedings plaintiff seeks to enjoin are conducted in an impartial manner and result in an uncontaminated determination. First, the Board appointed, from its members, a committee of three to hear and report on the charges against plaintiff. R.I.Gen.Laws § 5–37.1–6. This hearing committee specified the charges against plaintiff. *Id.* at § 5–37.1–7, informed him of the nature of same, and then held confi-

---

**6.** In *Withrow,* the United States Supreme Court reaffirmed the principle that a state statute should not be declared unconstitutional by a federal district court if a preliminary injunction could protect the plaintiff's interests during the ensuing litigation. 421 U.S. at 43, 95 S.Ct. at 1462. This is plainly such a case. Nevertheless, the Court knows of no legitimate converse proposition to the effect that such a plaintiff is entitled to an injunction solely to avoid the necessity for perscrutation of the constitutionality of a state statute. Thus, the Court must proceed to assess the merits of the plaintiff's challenge in order to ascertain whether or not the penumbras of the Constitution have arguably been breached.

dential hearings on those charges. *Id.* at § 5–37.1–6. Plaintiff was accorded (and exercised) the opportunity to appear with counsel; to produce witnesses and evidence in his own behalf; to cross-examine witnesses; and to review documentary evidence. The subpoena power of the Board was at his disposal throughout. *Id.* at § 5–37.1–8. The hearing committee then issued the Report to the full Board, replete with detailed findings of fact. If the temporary restraining order in this case is lifted, the Board will either hold further hearings or pass judgment on whether or not the plaintiff is guilty of unprofessional conduct as specified in the charges. *Id.* at § 5–37.1–11. The members of the hearing committee will be outnumbered at this juncture by Board members wholly uninvolved in the evidence-gathering function. *See* note 1, *ante.* After a final decision by the Board, plaintiff may seek judicial review pursuant to § 5–37.1–14 of the Act, with all of the due process connotations which such a remedy implies.

The Board's organization of a separate hearing committee to investigate and to assemble the facts indicates a bona fide attempt to minimize the risks arising from combining investigation and adjudication. *See Withrow v. Larkin,* 421 U.S. at 54 n. 20, 95 S.Ct. at 1468 n. 20. Moreover, under the Act, physicians under scrutiny by the Board are given, at an earlier stage in the proceedings, due process rights superior to those provided by the administrative scheme at issue in *Withrow,* where no cross-questioning of witnesses was allowed prior to the W.E.B.'s decision to institute criminal action or to revoke a provider's license. *Id.* at 35, 95 S.Ct. at 1458.

Plaintiff has presented no evidence that defendants have conducted the proceedings here in question in an inequitable or pre-judgmental manner. And, in any event, perusal of the Report belies any such inference. Plaintiff argues, nonetheless, that the Board's procedure is distinguishable

from that upheld in *Withrow* because, in the present case, the Board initiated the charges on its own impetus. There is no indication in *Withrow* as to how the investigation there came into being. *See id.* at 54, 95 S.Ct. at 1468. Even if the Court assumes, *arguendo,* that the investigation at issue in *Withrow* did not have its origins within the W.E.B., plaintiff's attempt to differentiate the instant action must be characterized as lame. The sockdolager is that there is no good reason to distinguish between the initiation of an investigation and the conduct of the inquiry itself for purposes of determining whether a violation of due process has occurred. As the Supreme Court noted in *Withrow,* it is typical for members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. *Id.* at 56, 95 S.Ct. at 1469. Determining whether to approve the filing of charges involves exactly the same type of discretion as does deciding whether or not to initiate an investigation. In neither case is the decision-maker inherently disabled from subsequently "judging a particular controversy fairly on the basis of its own circumstances." *Id.* at 55, 95 S.Ct. at 1468, citing *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). Indeed, given the statutory mandate of the Board, it would make a mockery of its processes if the law rendered it powerless to act *sua sponte* in the face of information coming to its attention whether or not a formal "outside" complaint was tendered.[7] The plaintiff is entitled to process which is due—not to the superimposition upon a valid regulatory paradigm of judge-made strictures which reduce the vitality of the administrative agency to a state of impotency. *Cf. Withrow v. Larkin,* 421 U.S. at 47–52, 95 S.Ct. at 1464–66. This philosophy is particularly apposite where, as here, there is not a scintilla of evidence that the conduct of the proceedings or the enforce-

---

**7.** This exact scenario, of course, was played out in *Pangburn,* where the C.A.B., in furtherance of its legislatively-delegated responsibility, plainly initiated its investigation without an external request. *Pangburn v. Civil Aeronautics Board,* 311 F.2d at 350–51.

ment decisions of the Board are or will be infected by improper motives. *Cf. Bordenkircher v. Hayes,* 434 U.S. 357, 365, 98 S.Ct. 663, 669, 54 L.Ed.2d 604 (1978).

Lastly, it should be noted that there is no basis on the present record for any suggestion that the defendants, as individuals, have a proprietary interest, financial or otherwise, in the investigation, consideration or adjudication of the charges, *see Withrow v. Larkin,* 421 U.S. at 47, 95 S.Ct. at 1464, nor that any personal animus toward Dr. Calenda has guided the Board in its deliberations. *Cf. Marshall v. Jerrico, Inc.,* 446 U.S. 238, 250 n. 12, 100 S.Ct. 1610, 1617 n. 12, 64 L.Ed.2d 182 (1980). In any event, the plaintiff's remonstrances seem to be systemic in nature, *i.e.,* addressed to the sweep of the statutory mosaic, not to any inculcate bias on the part of the members of the Board.

Plaintiff has placed heavy reliance, in his brief, on the line of cases headed by *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). This Court has no quarrel with *Murchison* on its facts, or with its progeny. *See, e.g., Figueroa Ruiz v. Delgado,* 359 F.2d 718, 721–22 (1st Cir.1966). Those cases, however, involve judges—not administrative agencies; and "the strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime." *Marshall v. Jerrico, Inc.,* 446 U.S. at 250, 100 S.Ct. at 1617. Moreover, even the stringent requirements of *Murchison* appear to be met here, as a "probability of unfairness" has not been shown to exist. *In re Murchison,* 349 U.S. at 136, 75 S.Ct. at 625. The actions of the defendants to this date vis-a-vis the plaintiff "satisfy the appearance of justice ... [and are] free of the 'possible temptation ... not to hold the balance nice, clear and true.'" *Figueroa Ruiz v. Delgado,* 359 F.2d at 721, *quoting In re Murchison,* 349 U.S. at 136, 75 S.Ct. at 625.

The Act seems in all respects to be secure on its face as against Dr. Calenda's Four-

teenth Amendment assault; the epiboly created by the placement of adjudicative functions atop investigative functions is not, without more, constitutionally offensive. As the proceedings at issue here cannot be distinguished in a meaningful way from those upheld in *Withrow v. Larkin, supra,* and because plaintiff has produced no evidence of taint or of special facts and circumstances elevating the risk of prejudgment, slant or unfairness to unacceptably high levels, 421 U.S. at 58, 95 S.Ct. at 1470, plaintiff has demonstrated, at this stage, scant likelihood of success on the merits.

Plaintiff also complains that the Board has refused to furnish him with information as to the supposed discussions upon which the decisions of the Board to investigate, charge and prosecute were based. The short answer to this grievance is that, subsequent to the initiation of this suit, the plaintiff has made no effort to secure same by employment of the processes of this Court. *See, e.g.,* Fed.R.Civ.P. 26, 34. Thus, passing obvious questions of materiality, relevancy, privilege and-or the existence or non-existence of any records of such purported discussions, and having in mind that the plaintiff has never specified what he believed those discussions would reveal and why evidence thereof would be germane, his reliance on conclusory allegations and on the bare fact of non-production avails him nothing. *See In re a Warrant Authorizing the Interception of Oral Communications,* 708 F.2d 27, 28–29 (1st Cir.1983).

To sum up, as the Supreme Court has stated:

> The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. *See Carey v. Piphus,* 435 U.S. 247, 259–262, 266–67 [98 S.Ct. 1042, 1050–51, 1053–54, 55 L.Ed.2d 252] (1978). The neutrali-

ty requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. *See Mathews v. Eldridge,* 424 U.S. 319, 344 [96 S.Ct. 893, 907, 47 L.Ed.2d 18] (1976). At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," *Joint Anti-Fascist Committee v. McGrath,* 341 U.S. 123, 172 [71 S.Ct. 624, 649, 95 L.Ed. 817] (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.

*Marshall v. Jerrico, Inc.,* 446 U.S. at 242, 100 S.Ct. at 1613.

The proceedings of the Board, on the record presently before the Court, palpably pass muster under these criteria.

Because plaintiff has failed to meet the four-part standard for the granting of preliminary injunctive relief, *see Scuncio Motors, Inc. v. Subaru of New England, Inc.,* 555 F.Supp. at 1124, his motion for a preliminary injunction must be denied, and the temporary restraining order heretofore issued must be, and it hereby is, dissolved.

SO ORDERED.