JAYA KRISHNA DHARMAVARAM, Plaintiff-Appellant, v. THE DEPARTMENT OF PROFESSIONAL REGULATION et al., Defendants-Appellees.

First District (6th Division)   No. 1—90—2649

Opinion filed July 5, 1991.

Schwartz & Rubin, of Chicago (Martin J. Rubin, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Susan Fredrick Rhodes, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE LaPORTA delivered the opinion of the court:

Plaintiff, Dr. Jaya Krishna Dharmavaram, appeals from an order of the circuit court which affirmed the decision of the Illinois Department of Professional Regulation (Department) revoking plaintiff's temporary certificate to practice medicine and denying his application for a permanent license to practice medicine in Illinois. On appeal, plaintiff contends that (1) the decision of the Department was against the manifest weight of the evidence; (2) he was deprived of the right to equal protection; and (3) he was deprived of the right to due process.

The record indicates that plaintiff earned his medical degree in 1981 in India. In 1987, he commenced post-graduate study at Cook County Hospital to obtain training in the field of plastic surgery. At the time plaintiff entered this post-graduate program, he held a temporary certificate to practice medicine at Cook County Hospital, and he had applied for a permanent license to practice medicine in Illinois. In December 1987, the Department brought charges against plaintiff, alleging that he had violated the Medical Practice Act of 1987 (Act) (Ill. Rev. Stat. 1987, ch. 111, par. 4400—1 *et seq.*) in connection with his work at the Cook County Hospital Ambulatory Screening Clinic (ASC).

The Department asserted, *inter alia,* that plaintiff had violated the Act by performing services beyond those prescribed by and incidental to his program of residency training as authorized by his temporary certificate, by engaging in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public, by engaging in immoral conduct in the commission of any act related to his practice, and by exhibiting a pattern of practice which demonstrated incapacity or incompetence to practice under the Act

(Ill. Rev. Stat. 1987, ch. 111, pars. 4400—17, 4400—22(A)(5), (A)(20), (A)(26)). The Department sought to revoke plaintiff's temporary certificate to practice and requested that his application for a permanent license be denied.

At an administrative hearing, the Department introduced evidence in support of the charges against plaintiff. The Department presented evidence that the ASC provides medical services to patients whose complaints are of a less serious nature and where the patients do not require admission to the hospital. The Department introduced evidence that plaintiff's work at the ASC was not prescribed by or incidental to his program of residency training in plastic surgery, but was voluntary and performed by plaintiff in order to earn extra money.

The Department presented the testimony of Mary R., who testified that she went to the ASC on August 10, 1987, because she was suffering from what she believed to be a kidney infection. After waiting several hours, she was treated by plaintiff at the ASC. Mary R. stated that when she entered the examining room, plaintiff hugged her "like I would embrace my mother." She testified further that it took her several minutes to understand plaintiff's accent. Plaintiff did not initially ask her about her symptoms or complaints, but asked her about her sexual activity with her husband and about her husband's nationality. Mary R. stated that plaintiff continually grinned at her during the entire examination and that this behavior was unnerving to her. Mary R. informed plaintiff that she had previously undergone a hysterectomy.

Mary R. also testified that at plaintiff's instruction, she put on an examining gown and removed only her slacks and underpants. Plaintiff then pinched the nipple of each breast through the gown, her brassiere, and her blouse. Thereafter, plaintiff conducted a vaginal examination while her legs were flat on the table and her feet were extended straight out from her body. Plaintiff did not direct her to place her feet into the stirrups of the examining table. First, plaintiff put a glove on his hand and commented to Mary R. that his fingers were very small. He then placed two or three fingers of his right hand into her vaginal cavity while his other hand rested on the table. Plaintiff manipulated his fingers in and out approximately 10 to 12 times over three to five minutes. Plaintiff did not speak to Mary R. at all during the examination except to comment that she had a very long vaginal canal. Plaintiff never asked Mary R. whether she was experiencing any pain during his examination.

Mary R. testified further that plaintiff removed his fingers from her vaginal cavity, stepped over, kissed her twice on the cheek, and said that she was nice. Mary R. then sat straight up and told plaintiff that a man had just been taken to jail for trying to kiss her. Plaintiff then asked Mary R. whether she had any girlfriends, whether they were married, whether they were pretty, and whether they "fooled around." Plaintiff repeated these questions about three times.

Mary R. stated that as soon as she was able to get dressed, she "was on the way to the door." Plaintiff gave her no diagnosis or prescription for her kidney problem. Plaintiff prescribed only vitamins and Tylenol and referred her to the urology clinic. Plaintiff also told Mary R. that he thought she should receive psychiatric treatment for the problem she was experiencing with her kidneys.

Mary R. testified that when she left the examining room, she went directly to one of the nurses to complain that plaintiff had kissed her. After speaking with Dr. Salem, the supervisor of the ASC, Mary R. made a written complaint which accused plaintiff of kissing her twice on the cheek, embracing her, and asking about her girlfriends. Mary R. stated that she did not detail the improprieties of the breast and vaginal examinations because it was then 1 a.m. and she wanted to go home.

Dr. Salem, supervisor of the ASC, testified that Mary R. told him that plaintiff had behaved in an unprofessional manner in that he embraced her and kissed her on the cheek twice. Dr. Salem then told plaintiff that a patient had complained that he had embraced her, kissed her, and asked personal, sexual questions. Plaintiff told Dr. Salem that he kissed Mary R. on the hand and had tried to be courteous. Dr. Salem asked Mary R. whether she would repeat her complaint in the presence of plaintiff, and she agreed. Plaintiff again denied that he had kissed Mary R. Dr. Salem then had Mary R. reexamined by a nurse practitioner. Dr. Salem allowed plaintiff to finish out his work shift, but Salem reported the incident to the director of the ASC the next morning.

Leon Lee, investigator with the Cook County Hospital police department, testified that he interviewed Mary R. over the telephone the day following her examination by plaintiff. During that conversation, Mary R. described the events of the previous day. This account of the examination conducted by plaintiff substantially corroborated Mary R.'s testimony at the administrative hearing. Lee was not questioned whether Mary R. told him that plaintiff had kissed her.

Plaintiff testified that when he met Mary R. she appeared upset, and he hugged her in a motherly fashion and kissed her two times.

He stated that he asked all his patients questions regarding their personal life because he wanted to develop a good rapport. He asked questions regarding the nationality of Mary R.'s husband to have a better understanding of her history. Plaintiff denied that he examined Mary R.'s breasts through her clothing and stated that she was wearing only an examining gown, which he pulled down in order to perform the examination. Plaintiff testified that he always offers to do a breast examination on all women patients.

Plaintiff testified further that the stirrups on the examining table were broken, but he did not request another examining room. He told Mary R. that he had small hands to relax her and to show her that he was not going to hurt her. Plaintiff stated that he manipulated his fingers several times in her vaginal canal to determine if there was any discharge, but there was none. He did not use two hands to examine Mary R.'s internal organs because she had told him she had undergone a hysterectomy. Plaintiff testified that he inquired as to Mary R.'s sexual practices and her relations with her girlfriends because he believed that she had difficulty in her relations with men based upon her answers to his questions. He diagnosed Mary R.'s trouble as incontinence and referred her to a urologist and gynecologist for further treatment. In plaintiff's opinion, Mary R. was not happy to be referred to other doctors after she waited all day to see a doctor for treatment. Plaintiff denied that he kissed Mary R. while she was lying on the examining table, but stated that he kissed her when she entered the examining room.

Tyna T. testified that she went to the ASC on August 10, 1987, complaining of an earache in both ears and of a headache. She stated that plaintiff initially asked her questions about her symptoms, but then began to ask her about personal issues. Plaintiff asked whether she was married, whether she had boyfriends, whether she had sexual relations with men other than her husband, and if she had any children. She told plaintiff that she did not have any children, and he said that he wanted her to have children. Tyna T. thought that it was unusual for plaintiff to ask her these questions, and she thought he would warn her about AIDS or other sexually transmitted diseases, but he never did.

Tyna T. testified further that while plaintiff was asking her these questions, he was caressing her arms and face. He put his hands on her lymph glands and then moved his hands downward. Plaintiff then said that he could not hear her heartbeat and asked her to raise her top. Tyna T. refused to raise her top because her vital signs had been taken by a nurse earlier. After she refused to raise her top, plaintiff

fondled her breasts by cupping them with his hands. Tyna T. testified that she was very nervous and embarrassed by this. Plaintiff told her that "she did not look like a Black girl because she did not have a wide nose or large breasts." Tyna T. testified that these comments were insulting and upsetting to her. Plaintiff continued to rub her arms and neck and to caress her cheek, and Tyna T. pulled away from him.

Tyna T. stated further that plaintiff then took her to another examining room to look into her ears with a light. He told her there was nothing wrong with her ears and sent her back to the first examining room. When plaintiff returned to the first examining room, he closed the door, leaned down, and kissed Tyna T. on the cheek. When she pulled away from him and stood up to leave, plaintiff told her to wait for a prescription. He then prescribed mineral oil and Q-tips. Tyna T. testified that plaintiff never advised her that her ears were impacted with wax. When she left the examining room, Tyna T. warned a waiting patient about the plaintiff.

Plaintiff testified that during his examination of Tyna T., he was looking for needle tracks or indications of IV drug abuse on her arms. He also stated that he palpated her face and sinuses to determine if there was any tenderness. Plaintiff stated further that at his request Tyna T. removed her blouse, and he listened to her heart and lungs. He testified that she gave her permission for a breast examination, but admitted that a breast examination was not related to the patient's complaints of earaches and a headache. Plaintiff stated that because her ears were impacted with wax, he was unable to see anything in Tyna T.'s ears. He told her to wash her ears and to return in a day or two for an ear examination. Plaintiff acknowledged that he told Tyna T. that she was "a nice patient," and he kissed her on the cheek.

Teresa W. went to the ASC on August 10, 1987, because she believed that she had a vaginal infection. When plaintiff entered the examining room, he shut the door and told her that he thought she was very pretty. Teresa W. testified that although plaintiff spoke with an accent, she did not have any trouble understanding him. When she told plaintiff that she thought she had a vaginal infection, he asked her how many boyfriends she had, when she last had sex, and whether she had oral sex. He then told her to remove her clothes and to get on the examining table. After she removed her clothing, Teresa W. put on an examining gown.

Teresa W. testified further that plaintiff put on some gloves and inserted one or two fingers of his right hand into her vaginal canal

and moved his fingers around for one or two seconds. She stated that plaintiff did not touch her with his left hand during the examination. He then moved his fingers to her clitoris and touched it for several seconds. Plaintiff told Teresa W. that she had "big lips" on her vagina. He then moved around to her side and kissed her on the jaw. Plaintiff subsequently touched her breasts just around the nipple, but did not touch any other part of her breasts. When plaintiff stopped touching her nipples, Teresa W. asked whether he was through. Plaintiff said that he was not finished, and he began touching her clitoris again. He then moved to her side and kissed her on the jaw again. Plaintiff then told Teresa W. that she could get dressed, and he left the room while she was dressing.

Teresa W. testified that when plaintiff returned to the examining room, she asked what was wrong with her, and he told her that she had "a lot of germs." Teresa W. stated that plaintiff never told her that she had gonorrhea.

Plaintiff testified that he conducted a bi-manual pelvic examination of Teresa W. and that his breast examination included her entire breast. He stated that he found Teresa W.'s vaginal lips swollen which indicated possible disease. Plaintiff also stated that he told her that she had gonococcal urethritis, but because she did not understand what that meant, he told her that she had "a lot of germs." Plaintiff testified that he kissed Teresa W. when she entered the examining room. As she was leaving the room, she was upset so he told her to "be a good girl, you are nice looking, change your life and be good." He then kissed her on the cheek. Plaintiff denied that he kissed Teresa W. while she was lying on the examining table.

The Department also presented the testimony of Barbara N. and of Linda M., who testified that they were examined by plaintiff and that he exhibited unprofessional and improper conduct during their examinations. The hearing officer found, however, that the evidence given by these two patients did not support a finding that plaintiff's conduct was violative of the Act.

The Department next introduced the testimony of Dr. Rocco Lobraico as an expert witness. Dr. Lobraico testified that he was a doctor of obstetrics and gynecology and had been practicing medicine since 1941. He stated that he had never kissed a patient, but he was not aware of any written standards prohibiting hugging or kissing patients. Dr. Lobraico reviewed the medical records and testimony of each of the patients who had complained about the plaintiff's conduct. He testified that in his opinion, plaintiff breached the standards of

professionalism and ethics prevailing in Cook County in 1987 in his examination of each of these patients.

Dr. Lobraico testified that it was inappropriate for plaintiff to embrace Mary R. and to question her about her sexual history while ignoring her complaints regarding her kidneys. He also stated that the breast examination performed by plaintiff was improper. Plaintiff should not have examined Mary R.'s breasts through her clothing and should not have pinched only the nipples. Plaintiff should have examined the entire breast tissue with two hands to see if there were any tumors or breast tenderness.

Dr. Lobraico also indicated that the pelvic examination performed by plaintiff on Mary R. was not proper. He stated that it was very important in conducting a pelvic examination for the patient to have her feet in the stirrups so the doctor can readily palpate the internal organs. Plaintiff should have placed two fingers into her vagina and used his other hand to bring the internal organs down to palpate them and determine their size, shape, and consistency. Because Mary R. had complained of kidney problems, plaintiff should have manipulated the bladder down to his examining fingers to determine if the bladder was tender to the touch. Although Mary R. had undergone a hysterectomy, plaintiff should have examined her ovaries, and he should have palpated the area around her kidneys to determine whether they were enlarged or tender. In Dr. Lobraico's opinion, plaintiff failed to examine Mary R. properly considering her complaint of urinary problems, and he acted unprofessionally in kissing her while he was conducting a pelvic examination.

Dr. Lobraico testified that in his opinion, plaintiff's examination of Tyna T. was improper and unprofessional. He stated that it was unusual to perform a breast examination on a patient who has complained of an earache. He stated further that plaintiff conducted the breast examination in an unorthodox manner, by cupping both breasts in his hands and by performing the exam through the patient's clothing. Plaintiff made insulting remarks about the patient's appearance, and his conduct made her nervous and embarrassed. Dr. Lobraico stated further that it was improper and unprofessional for plaintiff to kiss Tyna T. on the cheek and to attempt to embrace her.

Dr. Lobraico testified that it was unusual for plaintiff to conduct a pelvic examination on Teresa W., then a breast examination, and then another pelvic examination. He stated further that it was improper for plaintiff to perform the pelvic examinations with only one hand, and it was not proper to manipulate the patient's clitoris. In addition, it was improper for plaintiff to limit his examination of the patient's

breasts to only the nipple area. Dr. Lobraico also stated that plaintiff's explanation that she had "a lot of germs" failed to adequately inform the patient of her condition.

Dr. Lobraico stated further that checking a patient's arms for needle marks is not improper considering the prevalence of drug use among patients at Cook County Hospital. He also testified that it is proper to check lymph nodes when addressing a complaint of earaches and headaches. Lobraico indicated that it is proper for a doctor to re-check a patient's vital signs which had been taken over eight hours earlier. He also acknowledged that mineral oil is a means to remove excess ear wax from the ear canal.

The plaintiff called Dr. William Nowlin as an expert witness. Dr. Nowlin testified that he was a general surgeon, practicing in northwestern Indiana. Dr. Nowlin reviewed the medical records and testimony of each of the patients who had complained about the plaintiff's conduct. In Dr. Nowlin's opinion, plaintiff did nothing inappropriate and did not breach any standards of care in his examination of these patients. Dr. Nowlin admitted, however, that it was unprofessional to kiss a patient during a vaginal examination. He also acknowledged that a bi-manual examination is necessary to perform a complete pelvic examination and that a one-handed exam would be incomplete.

Dr. Nowlin testified that a pelvic examination normally takes approximately one minute, and there was nothing in Mary R.'s medical history which indicated a need to take as long as plaintiff did to perform the pelvic examination on her. Dr. Nowlin indicated, however, that a longer examination might be understandable where the doctor is of limited experience as was plaintiff. Dr. Nowlin stated that he did not see the relevance in plaintiff's questioning Mary R. concerning the sexual activity of her female friends. He also indicated that a breast examination which was limited to pinching of the nipple area would be incomplete and that a proper breast exam should not be performed through the patient's clothing.

Dr. Nowlin testified that it was unprofessional, not good judgment, and not in good taste to kiss a patient. He also stated that it was in poor taste for plaintiff to comment to Tyna T. about the appearance of most black women. Dr. Nowlin stated further that he saw no medical reason for plaintiff to ask Tyna T. whether she had sex with men other than her husband. Although he felt that kissing a patient was in poor taste, this did not change his opinion that plaintiff's examinations and evaluations were appropriate.

Plaintiff also called Dr. Bharat Barai as an expert witness. Dr. Barai testified that he was licensed to practice medicine in Illinois and in

Indiana and was certified in the specialties of internal medicine, oncology and hematology. Dr. Barai worked in the ASC at Cook County Hospital for one month in 1975 as part of his internship. He held a temporary certificate at that time. Dr. Barai testified that he does not practice obstetrics or gynecology, and he has never treated patients with the symptoms experienced by the patients seen by plaintiff.

Dr. Barai reviewed the medical records of the patients who had made complaints about plaintiff's conduct. In Dr. Barai's opinion, plaintiff did what was medically appropriate in taking the histories of these patients and in his examination, referral, and treatment of them. Dr. Barai indicated, however, that plaintiff needed more coaching and education on how to deal with patients. He stated further that it was not a breach of any medical standards to embrace a patient and that it was not inappropriate to ask Mary R. if her girlfriends were married and whether they were pretty. Dr. Barai also testified that in his opinion a pelvic examination done with only one hand was not inappropriate or incomplete. Dr. Barai stated that an inexperienced doctor such as the plaintiff would take longer to perform a pelvic exam than would an experienced practitioner. He also stated that rechecking an area where a problem is suspected is acceptable medical practice.

Plaintiff, testifying on his own behalf, stated that when he arrived in the United States, he worked for one year as an assistant to Dr. William Nowlin in Indiana. In 1987, he entered the post-graduate program in plastic surgery at Cook County Hospital. At that time, he held a temporary certificate to practice medicine at Cook County Hospital, and his permanent license application was pending. During his first year in the program, he rotated through and performed examinations at the ASC as part of his training. During his second year in the program, he voluntarily applied to work in the ASC to earn extra money. To be employed at the ASC, a person was required to (1) be on the Cook County Hospital payroll, (2) attend an orientation course offered by them and to pass a test, and (3) hold a temporary certificate with a permanent license application pending or must hold a permanent license. Although employment at the ASC was voluntary during the second year of the program, Cook County Hospital encouraged all residents, whether permanently or temporarily licensed, to work in the ASC. Although he received additional compensation, plaintiff considered his employment at the ASC a part of his training program. Like the other doctors working there, plaintiff had no choice as to the patients or the nature of the complaints he was required to treat.

Plaintiff stated further that he asked all of his patients questions regarding their personal life because he wanted to develop a good rapport. He confined questions regarding sex to those patients who experience problems relating to the pelvic area. He also stated that he always offered to do a breast examination on all of his female patients.

Plaintiff testified further that he did not kiss all patients upon their first meeting, but only those who appeared upset or depressed. Plaintiff stated that he kissed these patients in an attempt to console them, saying "you are nice, be easy." He testified that he kissed several other patients on August 10, 1987, who had not been called as witnesses. Plaintiff stated that he had seen other doctors and nurse practitioners kiss and hug patients of the opposite sex.

Following the hearing, the hearing officer issued a report detailing his findings of fact and conclusions regarding the charges brought against plaintiff by the Department. The hearing officer noted that plaintiff's accent may have contributed to certain difficulties in the patients' ability to communicate with him, but found that this circumstance was not the sole basis for the complaints made by the women who testified. The hearing officer found that plaintiff's examination of Mary R. and of Teresa W. demonstrated unprofessional conduct of a character likely to harm the public. He found that plaintiff's examination of Tyna T. demonstrated incompetence to practice. The hearing officer recommended the Department revoke plaintiff's temporary certificate and deny his application for a permanent license.

The hearing officer also found that plaintiff's employment at the ASC was not prescribed by or incidental to the program of residency in which he was enrolled and, therefore, exceeded the scope of practice authorized by his temporary certificate. Although the hearing officer found that plaintiff violated the statutory provisions restricting his practice of medicine within the scope of his temporary certificate, he recommended that the Department take no action on this violation because plaintiff's conduct had been encouraged by the hospital and was a common practice there.

The Medical Disciplinary Board adopted all of the findings of fact and conclusions of law by the hearing officer and recommended that plaintiff's temporary certificate of registration be revoked. The Medical Licensing Board adopted all of the findings of fact and conclusions of law by the hearing officer and recommended that plaintiff's application for a permanent license be denied.

Plaintiff filed a petition for rehearing on the ground that the hearing officers' conclusions were against the manifest weight of the evi-

dence. Plaintiff alleged further that he was denied due process by the variance between the charges contained in the Department's amended complaint and the grounds relied upon to revoke his temporary certificate and to deny his application for a permanent license. Additionally, plaintiff asserted that he was denied equal protection of the law, and he cited five cases involving permanently licensed doctors facing similar charges who were accorded disciplinary measures far less stringent than those imposed upon him.

The Director of the Department denied plaintiff's request for rehearing, holding that plaintiff had failed to present any new evidence to warrant a rehearing and that substantial justice had been done in the case.

The Director adopted the findings of fact, conclusions of law and recommendations of the Medical Disciplinary Board and ordered that plaintiff's temporary certificate be revoked. The Director also adopted the findings of fact, conclusions of law and recommendations of the Medical Licensing Board, but rejected the hearing officer's recommendation that no sanction be imposed for plaintiff's employment at the ASC. The Director ordered that plaintiff's application for a permanent license be denied.

Plaintiff thereafter filed a complaint for administrative review. After briefing and oral argument by the parties, the circuit court affirmed the decision of the Department. In a memorandum opinion, the court found that the evidence supported the result and that the decision was not arbitrary, capricious, or against the manifest weight of the evidence. The court also rejected plaintiff's claim that certain specific allegations found against him were never charged. The court found that the charges were sufficiently clear and detailed and that plaintiff was adequately apprised of the extent and seriousness of the charges prior to the hearing. The court declined to decide whether plaintiff's employment at the ASC exceeded the scope of practice authorized by his temporary certificate. The court found that any finding on this issue would not affect the holding in the case because the court had already affirmed the revocation of plaintiff's temporary certificate and the denial of his application for a permanent license.

Plaintiff has appealed the decision of the circuit court.

Initially, plaintiff asserts that the decision of the Department was against the manifest weight of the evidence.

■■ The findings and conclusions of an administrative agency on questions of fact are considered to be *prima facie* true and correct (Ill. Rev. Stat. 1987, ch. 110, par. 3—110; *Cicmanec v. Department of Registration & Education* (1989), 182 Ill. App. 3d 710, 538 N.E.2d

1166) and are not to be disturbed on review unless they are against the manifest weight of the evidence (*Massa v. Department of Registration & Education* (1987), 116 Ill. 2d 376, 507 N.E.2d 814; *Eastman Kodak Co. v. Fair Employment Practices Comm'n* (1981), 86 Ill. 2d 60, 426 N.E.2d 877; *Cicmanec*, 182 Ill. App. 3d 710, 538 N.E.2d 1166). For a judgment to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly evident. *Cicmanec*, 182 Ill. App. 3d 710, 538 N.E.2d 1166; *United Air Lines, Inc. v. Illinois Fair Employment Practices Comm'n* (1979), 69 Ill. App. 3d 519, 387 N.E.2d 875.

▮▮ A court of review is not to reweigh the evidence or make an independent determination of the facts. (*Sheldon v. Edgar* (1985), 131 Ill. App. 3d 489, 475 N.E.2d 956; *Odell v. Village of Hoffman Estates* (1982), 110 Ill. App. 3d 974, 443 N.E.2d 247.) Rather, the function of a court on review is to ascertain whether the final decision of the administrative agency is just and reasonable in light of the evidence presented. (*Sheldon*, 131 Ill. App. 3d 489, 475 N.E.2d 956; *Odell*, 110 Ill. App. 3d 974, 443 N.E.2d 247.) If there is any evidence in the record which fairly supports the determination of the agency, the decision is not against the manifest weight of the evidence and must be sustained on judicial review. *Sheldon*, 131 Ill. App. 3d 489, 475 N.E.2d 956; *O'Boyle v. Personnel Board* (1983), 119 Ill. App. 3d 648, 456 N.E.2d 998.

In the instant case, the administrative agency found that plaintiff's treatment of Mary R., Tyna T., and Teresa W. violated professional standards and sections 22(A)(5), 22(A)(20), and 22(A)(26) of the Act. (Ill. Rev. Stat. 1987, ch. 111, pars. 4400—22(A)(5), (A)(20), (A)(26).) In addition, the agency found that plaintiff's employment at the ASC was not prescribed by or incidental to his program of residency training and was beyond the scope of practice authorized by his temporary certificate in violation of section 17 of the Act. Ill. Rev. Stat. 1987, ch. 111, par. 4400—17(D).

The hearing officer noted that plaintiff's accent may have contributed to certain difficulties in the patients' ability to communicate with him, but found that this circumstance was not the sole basis for the complaints made by the women who testified. In fact, Tyna T. and Teresa W. both testified that they had no difficulty understanding plaintiff, and Mary R. testified that she was able to understand plaintiff after a few minutes.

The hearing officer heard and considered all of the evidence presented, including all of the testimony by the complainants, by plaintiff, and by the expert witnesses called by both parties. Upon review

of the evidence presented and after forming conclusions as to the credibility of the witnesses, the hearing officer determined that plaintiff's conduct was violative of the Act and warranted revocation of his temporary certificate and denial of his application for a permanent license. This determination was adopted by the Medical Disciplinary Board, by the Medical Licensing Board, and by the Director of the Department. There is ample evidence in the record to support this decision. Consequently, it cannot be found on review that the decision was against the manifest weight of the evidence.

Plaintiff argues that the hearing officer, the Medical Disciplinary Board, the Medical Licensing Board, and the Director of the Department employed an improper standard of review in considering the charges against him. Plaintiff claims that they inappropriately relied upon the standard of review for actions predicated upon assertions of medical malpractice. Plaintiff also asserts that the standard level of care in the ASC was cursory and not the same as one would expect to receive in a private doctor's office. Yet, plaintiff points to nothing in the record to support this claim.

In addition, plaintiff contends that in reviewing a case of license revocation or denial, the agency ought to consider the experience of the physician generally and within the area in which the questioned practice occurred, and the context in which the service was performed. He argues that a person with less training ought to be held to a different standard than one with substantially greater training. Yet, plaintiff offers no legal authority for this argument. To the contrary, the Act mandates that the Department hold a new applicant to the same standards of discipline as a person holding a permanent license. Ill. Rev. Stat. 1987, ch. 111, par. 4400—9(B)(1).

Moreover, we find that plaintiff was not so inexperienced as his argument might indicate. The record reveals that plaintiff practiced in India for approximately three years and worked with Dr. Nowlin in Indiana for 1½ years. Thereafter, plaintiff completed one year of his residency at Cook County Hospital. Consequently, plaintiff had approximately five years of practical and clinical experience with patients before the instant complaints were raised.

The record indicates that in reviewing the charges against plaintiff, the Department considered the provisions of the Act and the evidence presented at the administrative hearing. On this record, it does not appear and plaintiff has not shown that the Department employed an incorrect or inappropriate standard of review.

■ Plaintiff next contends that he was deprived of the right to equal protection because the Department's action was based upon his statutory classification as a temporary licensee.

In his petition for rehearing, plaintiff cited five cases of licensed physicians who allegedly were charged with conduct similar to that of the plaintiff but received sanctions which were more lenient than those imposed upon plaintiff. For each case, plaintiff listed the physician's name, the case number, and a one-sentence summary of the charges against the physician and the sanction imposed. Plaintiff did not provide any of the specific facts of the cases, mitigating circumstances, or the findings and conclusions of the Department in these cases. In addition, plaintiff did not present any affidavits, Department records, or testimony in support of his claim that these cases were decided under a different standard than that employed in his case. Consequently, plaintiff has not presented sufficient evidence to prove that he was judged by a harsher standard than were the other licensed doctors or to establish that he was deprived of the right to equal protection.

Moreover, even if plaintiff had shown that the five doctors whose cases he cited received more lenient sanctions than those imposed upon plaintiff, it is for the Department to determine the appropriate sanction to be imposed in each individual case. (*Massa,* 116 Ill. 2d 376, 507 N.E.2d 814.) The mere fact that five other physicians received lesser sanctions does not in and of itself render the Department's decision in plaintiff's case violative of his right to equal protection where there was ample evidence in the record to support the Department's decision.

■ Plaintiff argues further that he was entitled to be judged by a less stringent standard than that employed for experienced practitioners because he was inexperienced. This argument is without merit. As previously indicated, the Act mandates that the Department hold a new applicant to the same standards of discipline as a person holding a permanent license. (Ill. Rev. Stat. 1987, ch. 111, par. 4400—9(B)(1).) In addition, the record established that plaintiff had approximately five years of practical and clinical experience with patients before the instant complaints were raised.

Finally, plaintiff contends that he was deprived of the right to due process because certain conduct which was found to be violative of the Act by the Department was never charged in the complaint against him. He asserts that he was, therefore, unable to present an adequate defense at the administrative hearing.

Specifically, plaintiff refers to the fact that the complaint did not include any allegations that he used only one hand during his pelvic examinations of Mary R. and of Teresa W. Plaintiff also refers to the fact that certain conduct was found by the hearing officer to be demonstrative of plaintiff's incompetence to practice where plaintiff was under the impression that his conduct would be reviewed only as it related to the Department's claim that he acted improperly.

■ In order to charge a violation, an administrative agency is only required to present charges which are sufficiently clear and detailed to enable the respondent to intelligently prepare a defense. (*Brija v. Board of Fire & Police Commissioners* (1990), 202 Ill. App. 3d 363, 559 N.E.2d 978; *Altman v. Board of Fire & Police Commissioners* (1982), 110 Ill. App. 3d 282, 442 N.E.2d 305.) Such charges need not be technically precise or drawn with the same refinements and subtleties as court pleadings. (*Brija*, 202 Ill. App. 3d 363, 559 N.E.2d 978.) The complaint need only reasonably apprise the respondent of the charges against him. *Wierenga v. Board of Fire & Police Commissioners* (1976), 40 Ill. App. 3d 270, 352 N.E.2d 322.

■ In the instant case, plaintiff was sufficiently informed of the charges brought against him. The complaint against plaintiff specifically referred to the statutory sections he was alleged to have violated, the names of the patients involved, the conduct complained of, and the proposed sanctions for those violations. The allegations of improper touching, kissing, embracing, and of improper questioning of patients clearly put plaintiff on notice of the basis of the charges against him. In addition, counts IV through VIII of the complaint specifically charged plaintiff with incompetence in violation of section 22(A)(26) of the Act (Ill. Rev. Stat. 1987, ch. 111, par. 4400−22(A)(26)). Each of these counts clearly alleged that plaintiff improperly conducted medical examinations of the named female patients.

On this record, we find that plaintiff was adequately apprised of the nature, extent, and seriousness of the charges against him and that he was able to intelligently prepare a defense.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

RAKOWSKI, P.J., and McNAMARA, J., concur.