DECISION
Before this Court is an appeal by Tarek H. El Gabri, M.D. (appellant) from a decision of the Rhode Island Board of Medical Licensure and Discipline (Board). The Board's decision revoked the appellant's license to practice medicine due to unprofessional conduct. Jurisdiction in this Court is pursuant to G.L. 1956 § 42-35-15.
 Facts/Travel
The appellant is an ear, nose, and throat physician who maintained several offices within the State of Rhode Island. In January and February of 1996, two patients of the appellant (Patients A and B) filed complaints with the Board, alleging sexual misconduct on the part of the appellant. The Board forwarded these complaints to an Investigating Committee of the Board. Three members of the twelve member Board served on the Investigating Committee. While the investigation of these complaints ensued, a third complainant, the wife of Patient C, filed a complaint with the Board in August 1996, alleging sexual assault against the appellant. Thereafter, the Investigating Committee determined that the appellant had engaged in sexual misconduct with Patients A and B and had committed sexual assault upon the wife of Patient C. The Investigating Committee determined that this pattern of incidents constituted unprofessional conduct and posed an immediate danger to the public. Consequently, the Board, through its Investigating Committee, advised the Director of the Department of Health, Patricia A. Nolan, to suspend the appellant's license to practice medicine. Director Nolan ordered a pre-hearing suspension of the appellant's physician's license pursuant to § 5-37-8 on September 13, 1996.
On September 17, 1996, the Board presented the appellant with a specification of charges. The specification of charges alleged that the appellant had committed unprofessional conduct in regards to the above complainants in violation of § 5-37-5.1
(7) (immoral conduct in the practice of medicine), (19) (incompetent, negligent, or willful misconduct in the practice of medicine and failure to conform to minimal acceptable standards), and (30) (sexual contact between a physician and patient during the existence of the physician/patient relationship). A hearing was held on September 18, 1996, concerning both the specification of charges and the appellant's appeal of the Director's suspension order. This began a series of hearings which would cover approximately ten months to complete (from September 18, 1996 through June 16, 1997). On September 20, 1996, the appellant sought a temporary restraining order to lift the suspension imposed by the Director. Judge Clifton denied the appellant's motion for a temporary restraining order dated September 24, 1996.
A Hearing Committee of the Board, composed of three Board members, conducted the hearings. The composition of the Hearing Committee differed from the Investigating Committee. The Hearing Committee's legal counsel, Maureen Hobson (and Gregory Madoian at times), presided over the hearings, making evidentiary and procedural rulings. The Board heard testimony from numerous witnesses and received evidence. The Board found that the first witness to testify, Patient A, was credible. Patient A started treatment with the appellant in 1992. Patient A testified that beginning in March 1995, the appellant began to discuss details about his sex life with her and asked her personal questions about her sexual relationship with her husband. The appellant gave Patient A his beeper number and home phone numbers. The appellant learned from Patient A that Patient A was not having sexual relations with her husband and had not done so for the past three years. (Tr. September 18, 1996 at 28, 47).
Patient A testified that the appellant called her on May 27, 1995, asking to meet with Patient A. According to Patient A, the appellant was depressed and specifically mentioned that he could not be seen with her in a public place. (Tr. September 18, 1996 at 36-38). Patient A invited the appellant to meet her at her home. The appellant and Patient A engaged in sexual intercourse at the patient's home. Patient A testified that the appellant brought condoms and also gifts. She also identified a "zipper-like" scar on the appellant's hip.
Over the succeeding weeks, appellant pressed Patient A to continue to have sexual relations, but Patient A refused. Patient A testified that at her next appointment, June 19, 1995, the appellant exposed his erect penis to her in his office saying, "Look at me, I'm huge."
Patient A took her daughter for treatment with the appellant on June 27, 1995. Thereafter, according to Patient A, the appellant called Patient A and talked to her about oral sex and anal sex. She told the appellant to stop or she would call the authorities. The appellant threatened Patient A with harm, saying he had many influential friends. Patient A did not speak with the appellant again, but she received several phone calls from members of the appellant's staff inquiring about the patient's health.
The Board found that the May 27th date for Patient A's meeting with the appellant may have been inaccurate. However, the Board found that the appellant had seduced Patient A into having sexual relations during the doctor/patient relationship and that the appellant had attempted to force himself on her on June 19, 1995. (Decision of the Board, August 6, 1997).
The appellant sought to obtain Patient A's psychiatric records in order to impeach Patient A's credibility. Patient A had mentioned in her letter of complaint to the Board that she was taking Xanax and Prozac for depression and that the appellant knew she had been under the care of a psychiatrist for approximately five years. (Letter of January 19, 1996). She also stated in the letter that the behavior of the appellant caused her to suffer a mental breakdown which required treatment at Butler Hospital. (Letter of January 19, 1996). The Hearing Committee ordered the Investigating Committee to release Patient A's psychiatric records for in-camera review by the Hearing Committee and appellant's counsel. On September 19, 1996, Patient A brought an action in Superior Court seeking an injunction against release of her psychiatric records. Judge Israel granted a preliminary injunction preventing the release of the records. (Preliminary Injunction Order, October 2, 1996). Judge Israel found that § 5-37.3-7 (e) allowed the Board to use the psychiatric records only for investigative purposes and that the appellant could not rely on the exceptions under § 5-37.3-4 (b)(7), (8), (12). The appellant, who had intervened in the preliminary injunction action, appealed the ruling to the Supreme Court. The Supreme Court denied the appeal on the basis that the Superior Court's order was interlocutory and not subject to appeal. Jane M. Bentley v.Patricia A. Nolan. Director Rhode Island Department of Health,Committee of the Board of Medical Licensure and Discipline,
No. 96-516-A, Order, (R.I., filed October 24, 1996). Consequently, the appellant was unable to use Patient A's psychiatric records for cross-examination.
Next, Patient B testified. The Board found that Patient B was credible. The following facts were related by Patient B in her testimony Patient B began treatment with the appellant in March 1995. The appellant performed surgery on Patient B. The appellant continued to treat Patient B even though United Health Care would not continue paying for the services. Patient B believed the appellant had been flirting with her when he put his hands on her legs during appointments.
At one such appointment, Patient B told the appellant about a sexually related dream she had about him. The appellant then kissed Patient B for about five minutes. (Tr. September 24, 1996 at 22). The two arranged to meet at the appellant's Burrillville Office early one day in mid-August or September 1995, before the staff arrived for work. The appellant and Patient B had sexual intercourse in the sound proof booth at the office. The appellant gave Patient B a cell phone to contact the appellant. The appellant and Patient B had sexual relations on numerous other occasions: again at the sound proof booth, at motels such as the King's Inn, Suisse Chalet and the Days Inn in Willimantic, Connecticut in late September or early October 1995. Phone records indicate approximately 100 phone calls between the two during this time period, most of them initiated by the appellant. Throughout this time period, Patient B continued under the medical care of the appellant. The appellant continued to present gifts to the patient as well.
Patient B testified about three other occasions when she and the appellant engaged in sexual relations. On November 22, 1995, the appellant and Patient B engaged in sex at the patient's place of business in the facial room. On December 17, 1995, the two met at Lord Thompson Manor and engaged in sexual intercourse. In mid-January 1996, after the appellant returned from Egypt, the appellant presented Patient B with more gifts and the two had sex at the patient's friend's house. At this time, Patient B was still being treated regularly as a patient by the appellant. (Tr. September 24, 1996 at 62).
In January 1996, Patient B's husband discovered the cell phone which the appellant had given to Patient B. Patient B's husband confronted her about the phone and began to suspect a relationship between Patient B and the appellant. Patient B, fearful about losing custody of her son in a divorce action, collaborated with the appellant in setting up a meeting at appellant's office to deny the existence of a relationship between her and the appellant. The appellant tape recorded the conversation between the three in his office. After this meeting, the appellant and Patient B ceased to see each other. The Board found that the testimony and evidence indicated that the appellant had engaged in sexual relations with Patient B during the physician/patient relationship, taking advantage of the patient's depressed condition.
The wife of Patient C testified about two incidents of misconduct on the part of the appellant. The wife of Patient C told the appellant that both she and her husband were recovering from substance abuse, in offering information to assist the appellant in treating her husband. Her husband had spent two days in intensive care after bleeding profusely from the nose from post surgical complications. In a follow-up appointment on June 10, 1996, the appellant asked Patient C's wife if she could "feel the vibes" and told her that he wanted to "f___ her," in expressing his wish to have sex with her. On a return appointment on June 22, 1996, the appellant treated Patient C, and Patient C's wife's son was tested for allergies. When the appellant was alone with Patient C's wife, he asked her if his erection was "big enough" and made her touch his penis twice through his pants. The appellant also asked her questions about her sexual performance and whether she liked to have sex in front or back. Later, after examining her husband, the appellant asked to see Patient C's wife alone. The appellant yelled at her for not calling him when his wife was away. Patient C's wife testified that when she attempted to leave, the appellant stood in the doorway blocking the way. The appellant asked to see her "pussey" and "tits." Then as Patient C's wife tried to leave, the appellant pulled down her shirt and kissed the top of her breast. Patient C's wife left the room and did not tell her husband for fear that her husband would attack the appellant. Despite some inconsistency between Patient C's wife's testimony with Patient C's testimony as to the timing of when Patient C's wife was alone with the appellant, the Board found Patient C's wife's testimony was credible. The Board found that her testimony convincingly showed that the appellant exceeded the bounds of appropriate physician contact with a patient's family member.
The appellant took the stand as an adverse witness. He refused to answer a host of questions, invoking his Fifth Amendment privilege against self-incrimination, citing pending criminal actions. He either refused to answer or could not remember answers to questions such as whether the complaining witnesses were ever patients, whether he drove a gold Volvo at the time, what his cell phone numbers were, or when he took trips to Egypt. The appellant did admit to having a zipper-like scar on the hip.
Dr. Don Jaffe, M.D., a licensed physician certified in the specialty of otolaryngology (ear, nose, and throat specialist) testified as an expert witness. The appellant did not object to Jaffe's qualification as an expert witness. Dr. Jaffe testified that physician/patient relationships are governed by a national standard. He stated that sexual relations and interpersonal contacts between a doctor and patient are strictly forbidden. These ethical standards are taught in medical schools, peer groups, and medical seminars. Dr. Jaffe explained that such standards "were based on the practice of medicine many generations before mine that have to do with other human beings permitting us to involve ourselves [in] sometimes their most intimate knowledge and physical parts. We are allowed to touch parts of people in places their own mothers and fathers are prohibited. And one has to establish a set of limits that assure both us and the patient that that will be respected." (Tr. November 26, 1996 at 90). The Board noted that two of the three members of the Hearing Committee were medical doctors who could draw upon their own experience in determining the appropriate standard of conduct for a medical doctor in the practice of medicine.
Several employees and patients of the appellant testified on his behalf. In general, they testified that the appellant did not examine patients without another staff person present. Also, the complaining witnesses did not appear to be upset or flustered in the appellant's office on the days of the alleged misconduct. Toni Zarra (secretary), Marie LaBelle (office manager), Katherine Rose (licensed practical nurse), Tonette Robillard (doctor's assistant), and Dalida Pare (secretary), all former staff members of the appellant, testified on his behalf.
The Board specifically found that the testimony of the above former staff members and several patients of the appellant was not persuasive enough to defeat the testimony of the complaining witnesses and other evidence which showed that the appellant had engaged in unprofessional conduct. The Board also found that slight inconsistencies in identification of dates of events which happened two years prior to the witnesses' testimony, and slight inconsistencies in the sequence of events did not erode the credibility of the complainants.
Even though the former staff members testified that the office policy required a staff person present while the appellant examined a patient, two staff members had to admit that the appellant may have been alone at times with patients. LaBelle testified that she could not be sure whether the appellant was alone with the complaining witnesses. (Tr. February 23, 1997 at 43). Robillard admitted that patients might be alone with the appellant for a little while. (Tr. March 13, 1997 at 23, 25-26). LaBelle's testimony that the appellant could not have committed the misconduct alleged by the complaining witnesses because she was with the appellant at those times, was rejected by the Board as not credible. Finally, two former patients testified that they were sometimes alone with the appellant. (Tr. April 7, 1997 at 25-27, 34-35).
On February 13, 1997, after all of the complaining witnesses had testified and before most of the witnesses on the appellant's behalf had testified, one of the members of the Hearing Committee, Sabra Orton, became gravely ill. Director Nolan appointed Board member Stanley Aronson, M.D. to fill Orton's position on the Hearing Committee. Aronson read through the transcript of the proceedings which took place before February 13, 1997. Aronson was present for all of the hearings from February 13, 1997 to June 16, 1997. The other two Hearing Committee members, Paul E. Sapir, M.D. and Trina Barnes were present for all of the hearings.
The Board issued a decision on August 6, 1997, which was ratified and approved by Director Nolan. In its decision, the Board denied the appellant's appeal of the summary suspension issued September 13, 1996, finding that the pattern of "seriously exploitative conduct" against the three complaining witnesses constituted an imminent danger to the public which justified the imposition of a summary suspension of the appellant's medical license. The Board also found that the appellant "fostered sexual relationships with Patient A and Patient B" during the physician/patient relationship. In addition, the Board found that the appellant attempted sexual contact with the wife of Patient C and violated a duty owed to family members of patients in the appellant's office. The Board concluded that the appellant violated the accepted standards of practice which prohibit sexual relations with patients or family members of patients. The Board also concluded that the appellant had engaged in immoral conduct and willful misconduct. Based on all of its findings, the Board revoked the appellant's medical license.
The appellant filed a timely appeal of the Board's decision to this Court. On appeal, the appellant argues (1) that the summary suspension was inappropriate and violated the appellant's due process rights; (2) the failure of the same three member Hearing Committee to hear and decide the case rendered the Board's decision invalid and violated the appellant's due process rights; (3) the Board improperly mixed investigatory, prosecutory, and adjudicatory functions; (4) the Board erred in permitting private counsel for complaining witnesses to interrupt the flow of evidence; (5) the appellant's inability to procure psychiatric records of Patient A for the purpose of cross-examination of Patient A's credibility violated the due process clause; (6) the Board permitted prejudicial, non-probative evidence of an uncharged sexual relationship with a patient; (7) the Board improperly joined three unrelated complaints; (8) the standards for unprofessional conduct were improperly applied to alleged conduct towards the wife of Patient C, as she was not one of the appellant's patients; (9) any sexual relations between the appellant and Patient A before the July 1995 amendment expressly prohibiting such conduct cannot constitute unprofessional conduct; (10) the Board's findings were clearly erroneous and (11) the Board imposed, a sanction clearly excessive.
 Standard of Review
The review of a decision of the Commission by this Court is controlled by R.I.G.L § 42-35-15 (g), which provides for review of a contested agency decision:
 "(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 "(1) In violation of constitutional or statutory provisions;
 "(2) In excess of the statutory authority of the agency;
 "(3) Made upon unlawful procedure;
 "(4) Affected by other error of law;
 "(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 "(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact. Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency.Berberian v. Dept. of Employment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. CoastalResources Management Council, 434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. R.I. Conflicts ofInterests Commission, 509 A.2d at 458. The Superior Court's role is to examine whether any competent evidence exists in the record to support the agency's findings. Rocha v. Public Util. Comm'n.,694 A.2d 722, 727 (R.I. 1997). The Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence. Rhode Island PublicTelecommunications Authority, et al. v. Rhode Island LaborRelations Board, et al., 650 A.2d 479, 485 (R.I. 1994).
 Summary Suspension
The appellant argues that the pre-hearing suspension was unlawful because it was clear to the Board that a post-deprivation hearing could not be completed within a reasonable time. The delay of almost a year in completing the post-deprivation hearings violated the appellant's due process rights, according to the appellant. The appellant also argues that material bias of the Investigating Committee Members tainted the summary suspension order. The three Investigating Committee Members were either employees or associated with Rhode Island Hospital and Landmark Medical Center. The appellant had been engaged in previous litigation against those two institutions. The appellant argues that this bias also tainted subsequent post-deprivation hearings, influencing the Hearing Committee to uphold the determinations of the Investigating Committee.
In the alternative, the Board argues that the Director properly issued a summary suspension order because the appellant's practice of medicine constituted an imminent danger to the public. The Board notes that the State has a compelling interest to ensure that health providers act in a safe, professional manner. The Board argues that the evidence before the Director supported a summary suspension, as the appellant was the subject of multiple sexual misconduct allegations, including complaints of actions which arose after the appellant had already been under investigation. The appellant also contributed to the delay in finishing the post-deprivation proceedings by asking for continuances. The Board also points out that the appellant failed to return to Judge Clifton for relief from the summary suspension order, which the appellant clearly had the authority to do. Judge Clifton retained jurisdiction to revisit the summary suspension issue, if necessary, after denying the appellant's motion for a temporary restraining order against the summary suspension order. In any event, the Board avers the delay in completing the post-deprivation hearings did not violate the appellant's due process rights.
In addition, the Board argues that in order for the appellant to succeed on his bias allegation, he must point to instances of actual bias by members of the Investigating Committee. General allegations of Committee members' associations with institutions are not sufficient to establish bias, according to the Board.
Under § 5-37-8, "[t]he director may, temporarily, suspend the license of a physician or limited registrant without a hearing if the director finds that evidence in his or her possession indicates that a physician's or limited registrant's continuation in practice would constitute an immediate danger to the public." Section 5-37-8 also requires a hearing before the Board within 10 days after imposition of the suspension. The regulation of health care providers constitutes a compelling state interest. Calenda v. Rhode Island Bd. of Medical Rev., 565 F. Supp. 816, 819-820 (D. R.I. 1983). Pre-hearing suspensions are justifiable in achieving compelling state interests. See Link v.State, 633 A.2d 1345, 1349 (R.I. 1993); see also Federal DepositIns. Corp. v. Mallen, 486 U.S. 230, 108 S.Ct. 1780, 1787-1788, 100 L.Ed.2d 265 (1988). "[E]ven though there is a point at which an unjustified delay in completing a post-deprivation proceeding `would become a constitutional violation' . . ., the significance of such a delay cannot be evaluated in a vacuum. In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken." Id.
at 1788 (citations omitted). A nine month delay is not a per se unconstitutional delay for the resolution of a post-deprivation hearing. See Cleveland Bd. of Educ. v. Loudermill, 420 U.S. 532, 105 S.Ct. 1487, 1496, 84 L.Ed.2d 494 (1985).
In the instant case, the Director had ample grounds to impose a summary suspension. A pattern of allegations confronted the appellant, including pending criminal charges. The fact that a new allegation emerged, alleging a sexual assault in the appellant's office, underscored the urgency of protecting the public. In Everett v. Georgia Bd. of Dentistry, 441 S.E.2d 66, 67 (Ga. 1994), the Georgia Supreme Court upheld a summary suspension under a similar situation as the instant case, as the dentist inEverett had been accused of sexual offenses at his office building. The court in Everett stated, "under the circumstances, due process did not require a hearing prior to the summary suspension."Id.
The Board also complied with the statutory requirement to hold a post-deprivation hearing within 10 days of the suspension. Hearings were begun five days after the suspension on September 18, 1996. In Mallen, supra, the court stated in regard to the regulation of banking officials that "[t]he magnitude of the public interest in a correct decision counsels strongly against any constitutional imperative that might require overly hasty decision making." Mallen. 108 S.Ct. at 1789. As is indicated inCalenda, supra, the public interest in the regulation of health care surely arises to an even greater magnitude than that for banking officials. That public interest must outweigh the appellant's interest in his livelihood, just as the public interest in regulating the banking industry outweighs a banking official's interest in his livelihood. Mallen. 108 S.Ct. at 1789-1790. The risk that the interim decision may have been mistaken is minimized by the fact that the Investigating Committee thoroughly investigated the matter for some nine months before the suspension order was issued. This is similar to Mallen. where an independent body found probable cause that the banking official had committed an offense. Id. at 1790. In addition, the fact that the appellant helped create many of the delays in the proceedings by seeking injunctive relief in this Court and asking for several continuances evidences that the appellant was not overly concerned with the delay which deprived him of his medical license. The appellant even had the option of returning to Judge Clifton to redress his concerns about the continued suspension. The appellant was well aware of this option, even warning the Hearing Committee that he could return to the Superior Court to seek relief from Judge Clifton, although he never did so. (Tr. February 13, 1996 at 11-12). In analyzing all of the above considerations, this Court finds that under the circumstances of the instant case, the delay in completion of the post-deprivation proceedings did not violate the appellant's due process rights.
The appellant's allegations of bias towards the Investigating Committee are not directed towards any specific instances of conduct on the part of the committee members. "[T]he Due Process Clause of the Fourteenth Amendment guarantees that a person shall not be tried before an administrative tribunal that is biased or otherwise indisposed from rendering a fair and impartial decision." La Petite Auberge v. R.I. Com'n for Human Rights,419 A.2d 274, 283 (R.I. 1980). However, "[a] respondent who raises this sort of irregularity must overcome a `presumption of honesty and integrity in those serving as adjudicators'" or as in the instant case, those serving as investigators. Id. at 284 (citingWinthrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712, 724 (1975)). The fact that members of the Investigating Committee held positions with the two aforementioned medical institutions does not prove bias on the part of those Board members without additional specific evidence of such a bias. See Davis v. Wood, 444 A.2d 190, 192-193 (R.I. 1982); see also, Carroll v. Goldstein, 100 R.I. 550,217 A.2d 676, 681 (1966). Having failed to present any specific evidence indicating biased actions on the part of the committee members, the appellant, here, has not overcome the presumption of integrity in the members of the Investigating Committee.
 Composition of the Hearing Committee
Next, the appellant argues that the replacement of one Hearing Committee member with another Board member required the Board to recommence the hearing process de novo, in order to allow the new member, Aronson, to hear the testimony of all the witnesses. The appellant argues that the statutory framework for the medical board mandates that three members constitute a quorum; therefore, all three must hear all of the testimony. As the Board did not restart the hearing process de novo, the appellant argues that the decision of the Board is invalid. The appellant also argues that the failure of all committee members to hear all of the testimony violates the due process clause. The appellant states that because the instant case hinged on the credibility of the witness, due process required all of the committee members to hear all of the witnesses and personally assess the credibility of those witnesses.
The Board argues that the statutory framework for the Board does not specify what must occur when a Hearing Committee member becomes ill and must be replaced. Under the APA, not all of the hearing officers are required to hear all of the evidence. Therefore, the Board argues that the APA (pursuant to §42-35-11) allowed the Board to replace one member of the Hearing Committee due to illness. Having that new member read the transcript and hear the rest of the testimony was acceptable because the APA recognizes that situations will arise where hearing officers have not heard all of the evidence. The Board also argues that the principles of due process were not violated when one Hearing Committee member did not hear all of the testimony. According to the Board, only if the demeanor or manner of testifying of the witnesses was an issue would due process require the presence of the hearing officers during the testimony.
Under § 5-37-5.2 (e), "[t]hree (3) members of the hearing committee shall constitute a quorum for the transaction of business." Section 42-35-11 recognizes that in some instances hearing officers for agencies may not hear all of the evidence when it states, "whenever in a contested case a majority of the officials of the agency who are to render the final decision have not heard the case or read the record, the decision, . . . shall not be made until a proposal for decision is served upon the parties, and an opportunity is afforded to each party adversely affected to file exceptions. . . ." In interpreting §42-35-11, the Rhode Island Supreme Court has stated, "Our own Administrative Procedures Act contemplates the fact that agency officials need not hear the evidence." In Re Rhode Island Com'nFor Human Rights, 472 A.2d 1211, 1214 (R.I. 1984). In a footnote the court also mentioned that "[t]he Administrative Procedures Act obviously recognizes that the sheer number of cases before an agency forbids a quorum from actually hearing them." Id. In analyzing due process considerations, the court concluded "that procedural fairness exists when a quorum of the commission reaches its decision after having access to a transcript of the hearing and also the evidence, some of which may have been gathered by its staff. There is a presumption, soundly established, rationally reached, that administrative officials will properly consider the evidence before they reach a decision." Id. Due process rights are satisfied when each committee member has either heard all the evidence or read the transcript in its entirety. Pet v. Department of Health Services,638 A.2d 6, 19 (Conn. 1994). When a hearing officer is replaced in the middle of the proceedings, an agency has the discretion to hold a de novo hearing "to the extent that material facts in any case depend on the determination of credibility of witnesses as shown by their demeanor or conduct at the hearing." New EnglandCoalition v. U.S. Nuclear. Etc., 582 F.2d 87, 100 (1st Cir. 1978). A de novo proceeding need not be held if "it fairly could be said that a credibility evaluation from hearing and seeing the witnesses testify was unnecessary." Id.
Two of the members of the Hearing Committee heard all of the testimony. The other member read the complete transcript of the testimony he missed and heard approximately half of the testimony in the proceedings. The Board complied with the APA standards when its replacement member read the transcript of the proceedings he missed. A majority of the Board personally viewed the demeanor and conduct of all of the witnesses who took the stand. Hearing proceedings in which a majority of the committee views the credibility of witnesses satisfies both the APA and the requirements of due process. This Court finds that because the decision of the Board was unanimous, it was not necessary for the third member, Aronson, to have been present for all of the witnesses' testimony. A credibility determination from Aronson was not necessary because both Sapir and Barnes viewed the credibility of the witnesses and arrived at the same conclusion. Under the emergency circumstances of this case, this Court finds that the proceedings satisfied due process. If the vote of Barnes and Sapir had been split, then a credibility determination from Aronson may have been necessary, and a de novo hearing may have been required. However, the case law demonstrates the hearing proceedings in the instant administrative setting complied with the due process clause, as two out of the three committee members heard all the testimony, and the third read the transcript of the testimony he missed.
 Investigatory, Adjudicatory and Advisory Functions
The appellant argues that the Board commingled adjudicatory, investigating, and advisory functions in violation of the due process clause. He states that members of the same overall Board serve on the Investigating and Hearing Committees, constituting an improper commingling of functions because the Investigating Committee is involved in the prosecution. The appellant also argues that attorney Bruce McIntyre, who prosecuted the instant action, improperly commingled functions as prosecutor and advisor to the Board. The appellant notes that McIntyre took the side of the Investigating Committee in successfully arguing against the release of Patient A's psychiatric records.
The Board counters by arguing that investigative and adjudicatory functions need not be divided into wholly separate boards or agencies. The Board, argues that the Hearing Committee and Investigating Committee acted separately. In addition, the Board states that attorney McIntyre's role as advisor to the Board as a whole, and prosecuting attorney in the instant case, does not offend the requirements of due process.
"Although the appropriate resolution of investigatory, inquisitorial, and adjudicative roles in a single administrative body has been one of the most problematic features of state and federal administrative law . . . the existence of a combination of these functions does not establish the unconstitutionality of an agency's structure or operations." La Petite Auberge, 419 A.2d at 284 (citing Winthrow, 95 S.Ct. at 1466-1467). Similar to the previous discussion on bias, "[t]he Supreme Court of the United States has ruled that in order to challenge an administrative process successfully on the grounds of a combination of incompatible functions, a respondent must show that the procedures `pos[e] such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.'" Id. (citing Winthrow, 95 S.Ct. at 1464). The court in LaPetite Auberge emphasized that the same person who presides at the hearing stage cannot participate in the prosecution or preparation of a case. Id. However, it noted with approval the statutory scheme for the Rhode Island Commission for Human Rights, which specifically requires one set of commissioners for the hearing and decision making process and an entirely different set of commissioners for the preparation of the case. Id. The statutory scheme for the medical board likewise prevents members of the Investigating Committee from participating in the hearing process. § 5-37-54.2 (d). "Broadly speaking, the separation of functions that prevails in a modern administrative agency, allotting the prosecutorial function to a staff of attorneys or other personnel who will not participate in the eventual decision, is a common and recommended feature of American administrative enforcement activity." LaPetite Auberge, 419 A.2d at 284.
In the instant case, different board members served in the separate investigating and hearing committees. This Court finds no evidence of record which demonstrates that the investigating and decision making processes were commingled. The attorney who prosecuted the instant matter did not simultaneously serve as advisor to the Hearing Committee. Maureen Hobson served as legal counsel to the Hearing Committee and presided over the hearings. "In the absence of evidence that the same individuals are involved in the building of an adversary case and the deciding of the issues . . . or that other special circumstances made the risk of unfairness intolerably high . . . [this Court] cannot find that any risk of actual bias or prejudgment . . . is here presented." Id. at 285 (citations omitted).
Also, the fact that Attorney McIntyre serves as legal advisor to the Board as a whole, while also serving as prosecutor in the instant case, does not violate the due process clause in light of the above statutory scheme which separates board functions. Nothing in the record demonstrates that McIntyre exercised influence over the Hearing Committee. McIntyre's efforts to block the release of the psychiatric records were not incompatible with his prosecutorial role, and in fact show a genuine separation between the hearing and prosecutorial functions of the Board, as it was the Hearing Committee which issued a subpoena for the records. The appellant has not offered sufficient proof to overcome the presumption that McIntyre, in his role as legal advisor to the Board and prosecutor for the instant case, acted in a non-biased manner. See Evers v. Board of MedicalExaminers. 516 So.2d 650, 653-654 (Ala. Civ. App. 1987).
 Counsel for Complaining Witnesses
The appellant also takes issue with the involvement of counsel for the complaining witnesses in the proceedings. At times during the hearing process, counsel for the complaining witnesses interrupted the proceedings to voice an objection or advise their clients of information which was privileged. The appellant asserts that the disruptions were pervasive and violated the due process clause because the proceedings were quasi-criminal in nature.
The Board argues that it had the discretion to allow the complaining witnesses to have their counsel present at the hearings. The complaining witnesses were fearful of the appellant, noted the Board.
"[D]isciplinary proceedings are civil in nature, designed primarily to protect the members of the public from the actions of [those] who are unwilling or unable to conform their conduct to the standards of professional conduct adopted by this Court for the welfare of the people." Lisi v. Bashaw, 599 A.2d 1038, 1040 (R.I. 1991) (defining attorney disciplinary proceedings as civil proceedings not criminal). Also, our Supreme Court has noted that "[a]n expert administrative tribunal concerned with advancing the public welfare should not be rigidly governed by rules of evidence designed for juries." DePasquale v. Harrington,599 A.2d 314, 317 (R.I. 1991).
In reviewing the whole record, this Court finds that any interruptions incurred from the complaining witnesses' counsel were not so pervasive as to violate the due process rights of the appellant. An administrative proceeding is not as rigid in the presentation of evidence or in its procedure as would be expected in a criminal trial. The Board did not abuse its discretion in allowing the presence of counsel for the complaining witnesses.See Hodosh v. Ford Motor Co., 477 A.2d 77, 78 (R.I. 1984). The Hearing Committee dutifully reprimanded counsel when they had no standing to lodge objections, and maintained order so that any disruptions were infrequent and minimal.
 Psychiatric Records
After the initial witness, Patient A, testified, the appellant delayed cross-examination of her in order to procure Patient A's psychiatric records. Patient A succeeded in blocking the appellant's access to the psychiatric records by gaining injunctive relief in this Court. The appellant argues that he was improperly denied access to the psychiatric records. The appellant argues that he needed those records for an effective cross examination in order to test the credibility of Patient A. The appellant states that Patient A put her psychiatric condition at issue when she mentioned her psychologically vulnerable state in the letter of complaint she sent to the Board. The appellant points to four exceptions which allow the release of medical records in the instant situation.
Alternatively, the Board argues that the issue of the release of the psychiatric records was fully litigated before Judge Israel. The Board argues that the principles of collateral estoppel prevent this Court from relitigating the matter. The Board states that the denial of access to Patient A's psychiatric records would not violate due process in an administrative setting. Finally, the Board points out that one Hearing Committee member was a psychiatrist who had the expertise to analyze whether Patient A was delusional and instead concluded she was credible. The psychiatrist committee member heard all of the presented testimony.
"[U]nder the general doctrine of res judicata, a subsidiary doctrine known as collateral estoppel would preclude a party from relitigating issues with a party or those in privity with him that had actually been litigated in a prior case." MulhollandConst. v. Lee Pare Assoc., 576 A.2d 1236, 1238 (R.I. 1990). As a subsidiary doctrine of res judicata, finality of judgment in the earlier action is required. See El Gabri v. Lekas,681 A.2d 271, 275 (R.I. 1996). In the instant case, Judge Israel issued only a preliminary injunction. The order specifically stated that it would remain in effect until further order of this Court. Therefore, this Court is not precluded from revisiting the issue of release of the psychiatric records. The injunction was not a final adjudication on those issues, but merely found a high probability of success on the merits of Patient A's assertion that the psychiatric records could not be released.
In his order Judge Israel found that § 5-37.3-7 (e) allowed the Board to secure Patient A's psychiatric records only for investigative purposes. Section 5-37.3-7 (e) states:
 Nothing in this chapter shall limit the authority, which may otherwise be provided by law, of the board of medical licensure and discipline to require a medical peer review board to report to it any disciplinary actions or recommendations of that board or to transfer to its records of that board's proceedings or actions, including confidential medical information, or restrict or revoke a physician's license to practice medicine, provided that in any such legal action personally identifiable confidential health care information shall not be used without written authorization of the person or his or her authorized representative or upon court order.
The above statute applies only to medical peer review boards which include review boards which are attached to health care institutions. See § 5-37-1 (10)(a). The definition of peer review board does not include the Investigating Committee as such a body. § 5-37-1 (10)(a). Therefore, § 5-37.3-7 (e) cannot serve to block the appellant's access to the psychiatric records of Patient A. However, the intent of the Health Care Information Act is to allow the Medical Board to subpoena medical records only for investigative purposes. See In Re Bd. ofMedical Review Investigation, 463 A.2d 1373, 1376 (R.I. 1983). The court stated, "Thus, the purpose of the act is not violated by the board's subpoenaing a physician's records of his patients during a board investigation of alleged unprofessional conduct on the part of the physician because the preliminary investigations are confidential." Id. The court went on to say that "only when the board is in the process of revoking or restricting a physician's license that the privilege comes into play." Id. The court finally stated that the information could be used by the Board if it is not personally identifiable. Id.
The information in the instant case would be personally identifiable. Patient A brought up the issue of her psychiatric condition only at the confidential investigatory stage. She did not bring up her psychiatric condition when she testified during the hearing. Because Patient A did not put her psychiatric condition at issue for the hearing, the appellant was not entitled to such information. Patient A was not the subject of the disciplinary proceeding, rather the appellant was. None of the exceptions listed under § 5-37.3-4 (which allow release of medical records without patient consent) apply because Patient A did not put her psychiatric condition at issue for her testimony before the Board. The clear inference of In Re Bd. ofMedical Review Investigation is that Patient A's privilege is in force when the Medical Board's proceedings move from the investigation stage to "the process of revoking or restricting a physician's license." Because, the disciplinary proceeding is civil in nature, due process rights are not violated in limiting the appellant's ability to cross-examine Patient A somewhat, by denying him access to Patient A's psychiatric records. SeeHerridge v. Board of Registration in Medicine, 6438 N.E.2d 745, 747 (Mass. 1995). As the patient in Herridge, nothing in the record indicates that Patient A was delusional, only that she suffered from depression. Even if one were to conclude that the appellant was wrongfully denied the psychiatric records, said denial did not substantially prejudice the rights of the appellant. The Board still had substantial evidence of record to revoke the appellant's medical license for his actions in regard to Patient B and the wife of Patient C.
 Uncharted Conduct
The appellant further argues that the Board improperly allowed the prosecution to introduce prejudicial evidence that the appellant engaged in sexual relations with an individual who was not included in the specification of charges. The appellant also argues that he was improperly denied the opportunity to question Michael Berry, a former boyfriend of Patient A, on the witness stand.
In response, the Board argues that the appellant "opened the door" to the testimony of a witness who mentioned conduct which was not contained in the specification of charges, because the appellant asserted he was never alone with patients. Veronica Daniels testified that her friend Lynn Beausoliel was alone with the appellant. (Tr. April 7, 1997 at 27). The Board states that such testimony was acceptable rebuttal testimony. of course, during this rebuttal testimony Daniels also mentioned that she believed Beausoliel was having an affair with the appellant. (Tr. April 7, 1997 at 31). The Board argues in regard to this testimony that the appellant never raised an objection. The Board finally argues that the testimony of Daniels was admissible because uncharged acts are admissible to show motive and intent.
"It is an established rule of law in Rhode Island that this Court will not consider an issue raised for the first time on appeal that was not properly presented before the trial court."Bouchard v. Clark, 581 A.2d 715, 716 (R.I. 1990). This Court has searched the record and has found no objection to the testimony of Veronica Daniels or Lynn Beausoliel. Therefore, this particular issue is not properly before the Court.
Even if this Court were to decide the issue, the Court finds that the testimony was admissible to prove the appellant's "motive, opportunity, intent. . . ." State v. Brown,626 A.2d 228, 233 (R.I. 1993). In Hubin v. Shira, 563 P.2d 1079 (Kan. App. 1977), the Kansas Court of Appeals upheld the admission of testimony of other dental assistants that the accused had committed sexual misconduct towards them as such testimony was proper in a civil case to show motive and intent. Finally, the Board properly concluded that the proposed questioning of Michael Berry was not relevant, as it had been at least five years since he had a relationship with Patient A.
 Joinder of Complaints
The appellant next argues that the consolidation of all three complaints into one proceeding substantially prejudiced him. The appellant admits that charges of similar character may be joined in one proceeding, but asserts that in the instant case the charges were not narrowly similar and even if they are so construed, the prejudicial effect of hearing all three in one proceeding is too great.
The Board refutes the appellant's citation to criminal law on joinder by stating that the instant case is civil in nature; therefore, the concerns inherent in joining multiple offenses do not apply. The Board also states that the statutory scheme on unprofessional conduct envisions bringing multiple charges in one proceeding.
As mentioned earlier, this Court finds that the instant proceedings are civil in nature. See Bashaw, 599 A.2d at 1040. An administrative proceeding does not have the same heightened concerns as a criminal trial in which the accused faces possible incarceration. The charges, all of which involved sexual misconduct at the appellant's office, were similar enough to be brought within one proceeding and did not substantially prejudice the appellant. See State v. Trepanier. 600 A.2d 1311, 1315-1316 (R.I. 1991).
 Unprofessional Conduct
The appellant further argues that the definition for unprofessional conduct cannot apply to alleged conduct against the wife of Patient C. The appellant notes that the standards for unprofessional conduct refer to the practice of medicine. As the wife of Patient C is not a patient, she is not subject to the appellant's practice of medicine, argues the appellant. The appellant also states that the immoral conduct provision is void for vagueness.
In addition, the appellant argues that any alleged sexual relations he may have had with Patient A, before the statutory amendment of July 1995 expressly prohibiting doctor/patient sexual relations, cannot constitute unprofessional conduct. The appellant argues that the enactment of the amendment demonstrates that sexual relations between a doctor and patient were not prohibited before the amendment.
The Board responds to the above arguments by first stating that the assault on the wife of Patient C took place at the appellant's office when her husband and son were there for treatment. The Board argues that such a situation creates a nexus between the appellant's practice of medicine and his unprofessional conduct. The Board also points out that the statutory scheme specifically mentions that unprofessional conduct is not limited to the listed items.
In regard to Patient A, the Board argues that sexual relations with a patient before the amendment of July 1995 still qualified as unprofessional conduct. The Board argues that the amendment simply codified the existing standard.
Under § 5-37-5.1, "[t]he term `unprofessional conduct' as used in this chapter shall include but not be limited to the following items. . . ." This demonstrates that unprofessional conduct may include activity which is not specifically described in the statute. Undoubtedly, in order for the prohibition on immoral conduct (§ 5-37-5.1 (7)) to survive a void for vagueness challenge, the conduct must be connected to the appellant's practice. In the instant case, the conduct of the appellant was intrinsically linked to the practice of medicine, as the victim was the wife of a patient waiting for her husband and child in the appellant's office. In Lind v. Medical LicensingBd. of Ind., 427 N.E.2d 671 (Ind. App. 2 Dist. 1981), the Indiana Court of Appeals found that a physician's license could be revoked for misconduct which involved non-patients.
In Lind, a physician's license was revoked in part for actions conducted against non-patients. Id. at 675-681. Such actions included inducing persons to vandalize non-patients' homes and hiring people to shoot at two other doctors. Id. A doctor may be disciplined for misconduct involving non-patients.Medical Licensing Bd. of Indiana v. Ward, 449 N.E.2d 1129, 1140 (Ind. App. 4 Dist. 1983). Both of the above courts also rejected "void for vagueness" arguments. The Lind court noted that in the context of medical licensure, statutes which prohibit "gross immorality" have a generally understood meaning, especially in light of specific misconduct mentioned in the statute. Lind, 427 N.E.2d at 681. However, the court noted that it is impossible to list every misconduct which would justify revocation of a license, so a general provision prohibiting immoral conduct in the context of medical practice is valid. Id. at 681-682.
In the instant case the appellant's conduct towards Patient C's wife was in the context of his medical practice, as Patient C's wife was a family member of a patient, waiting for that patient in the appellant's office. The court in Ward also found that a general provision prohibiting "willful or wanton misconduct" was not void for vagueness, as the provision provided sufficient warning to physicians when looked at in the context of the physician's medical practice. Ward, 449 N.E.2d at 1145-1146. The court also noted that certain actions, such as sexual misconduct, obviously "shock the sensibilities" and do not further the alleviation of human ills; hence they qualify as misconduct. Id.
Medical Boards have broad authority to regulate the medical profession, including the authority "to sanction physicians for conduct which undermines public confidence in the integrity of the medical profession." Sugarman v. Bd. of Regis. In Medicine,662 N.E.2d 1020, 1023 (Mass. 1996). Many jurisdictions have disciplined medical professionals for conduct not directly related to the practice of medicine. See Raymond v. Board ofRegistration In Medicine, 443 N.E.2d 391 (Mass. 1982) (court upheld the revocation of physician's license for the physician selling and possessing unregistered automatic submachine guns);Delozier v. State, 631 A.2d 228, 231 (Vt. 1993) (Medical Board had the power to discipline physician for immoral conduct not related to the practice of medicine, including sexual assault);Thorpe v. Bd. of Examiners In Vet. Medicine, 163 Cal.Rptr. 382, 384-385 (Cal.App.4th Dist. 1980) (veterinarian's license revoked for marijuana smuggling and insurance fraud); McLaughlinv. Board of Medical Examiners, 111 Cal.Rptr. 353, 357-359 (Cal. App. 2nd Dist. 1973) (physician properly disciplined for committing sexual assault at a public rest room, even though the action did not occur in his practice, as the Board could conclude that it would have a negative effect on his ability to practice medicine). In the instant case, the Board possessed statutory authority to discipline the appellant for his conduct towards Patient C's wife.
Additionally, Dr. Jaffee's expert testimony established that the appellant deviated from the applicable standard of care in his actions towards both the wife of Patient C and Patient A. In regard to Patient A, Dr. Jaffee's testimony clearly established that the standard of care prohibited sexual relations between a doctor and patient even before the statutory amendment of July 1995. The appellant attempted to discount Dr. Jaffee's expert testimony by asserting that he was not qualified as an expert in medical ethics and pointing out that he testified as to a national standard, instead of the proper local standard. Our Supreme Court recently established in Sheely v. Memorial Hosp.,710 A.2d 161, 166-167 (R.I. 1998), that expert testimony as to a national standard is now acceptable under Rhode Island law. Also,Sheely makes clear that Dr. Jaffee's experience as a long-time practicing ear, nose, and throat doctor qualified him to render an expert opinion on the ethical standards for other such doctors. Sheely, 710 A.2d at 166-167. The above establishes that the appellants conduct violated the professional standards of conduct at the time he committed the acts.
 Substantial Evidence
The appellant next argues that the Board's findings were clearly erroneous. The appellant argues that he did not engage in exploitative conduct against the complaining witnesses. The appellant also states that both Patient A and the wife of Patient C related testimony which defies common sense and plausibility. The Board argues that under the fair preponderance standard, the Board had substantial evidence to find unprofessional conduct on the part of the appellant.
This Court finds that substantial evidence of record existed in the form of witness testimony, telephone records, and gifts for the Board to conclude that the appellant committed unprofessional conduct. As the Board considered the evidence that both Patient A and the wife of Patient C took their children to see the appellant after incidents of misconduct, this Court must give deference to the Board, as the trier of fact, in finding that all of the complainants were nevertheless credible. When this Court finds that the Board's decision is supported by competent evidence, it must uphold the Board's decision. RhodeIsland Public Telecommunications Authority, 650 A.2d at 485. The Board found credible the testimony of Patient B that she and the appellant had several sexual liaisons after July 1995, while she was a patient of the appellant. Such conduct clearly violates § 5-37-5.1 (30), which prohibits sexual contact between a doctor and patient. Phone records also backed Patient B's testimony about their relationship. The Board found that Patient A was credible and also pointed to evidence of gifts given to Patient A. The appellant's conduct towards Patient A violated the standard of care required of the appellant (as explained by Dr. Jaffee) and demonstrated willful misconduct in violation of §5-37-5.1 (19). Both Patient A and B's detailed identification of the appellant's scarring on his hip also lended credibility to their testimony. In Haley v. Medical Disciplinary Bd.,818 P.2d 1062, 1069-1071 (Wash. 1991), the Washington Supreme Court similarly found that consensual sexual relations between a doctor and patients or former patients violated the standards of conduct for doctors. In Haley, the court disciplined a 66 year old doctor for having a consensual sexual relationship with a 17 year old former patient. The court in Haley also stated that the majority view is that physicians may be disciplined for acts not related to their narrow technical specialty. Id. The Board also found the wife of Patient C's testimony credible. The Board, as the finder of fact, had substantial evidence before it to find that the appellant committed immoral conduct in violation of §5-37-5.1 (7). As the above indicates, the Board can discipline the appellant for conduct against a non-patient. With regard to Patients A and B, Dr. Jaffee clearly testified that the trust inherent in the relationship between a physician and patient prohibits sexual relations between a doctor and patient because of the damage such conduct can do in inhibiting patients from allowing intimate treatment of maladies.
 Sanctions
Finally, the appellant argues that the sanction of revocation of his medical license was excessive in light of other medical board disciplinary cases. The Board argues instead that it properly used its discretion to invoke the ultimate sanction of revocation.
Pursuant to G.L. 1956 § 5-37-6.3, the director may impose sanctions. Included in the nine enumerated sanctions or conditions, one of which is the revocation of a license, is "Any other condition(s) or restrictions deemed appropriate under the circumstances." G.L. 1956 § 5-37-6.3 (9). Clearly, the Board possesses discretion to assess the sanction(s) it finds appropriate in each individual case. See also, Dharmavaram v.Department of Professional Regulation. 576 N.E.2d 361, 371 (Ill. App. 1st Dist. 1991).
 Furthermore, regarding the imposition of discipline,
 "[i]t is well settled that in reviewing the penalty imposed by an administrative body which is duly constituted to announce and enforce such penalties, neither a trial court nor an appellate court is free to substitute its own discretion as to the matter; nor can the reviewing court interfere with the imposition of a penalty by an administrative tribunal because in the court's own evaluation of the circumstances the penalty appears to be too harsh. Such interference . . . will only be sanctioned when there is an arbitrary, capricious, or patently abusive exercise of discretion." Shaykin v. Board of Medical Examiners, 62 Cal. Rptr. 274, 283 (Cal.App. 2nd Dist. 1967).
The Medical Board is empowered to impose discipline as it deems proper. Bryce v. Board of Medical Quality Assur., 227 Cal.Rptr. 483, 486 (Cal.App. 4 Dist. 1986). Revocation of one's medical license is not a disproportionate sanction for misconduct involving sexual contact. See Finelli v. Chassin, 614 N.Y.S.2d 634, 637 (A.D. 3 Dept. 1994) (the penalty of revocation of the physician's license is appropriate in cases of improper sexual contact); Dharmavaram, 576 N.E.2d at 371 (the department has discretion to revoke a physician's license for sexual misconduct). In light of the repeated misconduct and serious nature of the misconduct found by the Board and contained in the record, this Court does not find that the Board abused its discretion in ordering the revocation of the appellant's license.
After review of the entire record, this Court finds that the Board's revocation of the appellant's medical license was not in violation of constitutional or statutory provisions, was not in excess of its statutory authority, was made upon lawful procedure, and was not clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. The Board's actions were not arbitrary or capricious or characterized by an abuse of discretion, such that substantial rights of the appellant were not prejudiced. Accordingly, the appellant's appeal is denied, and the decision of the Board is affirmed.
Counsel shall prepare the appropriate judgment for entry.